**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 240676-U

Order filed August 12, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| GEORGE HIDALGO, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiff-Appellant, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-24-0676 |
| | ) | Circuit No. 20-L-969 |
| VILLAGE OF ROMEOVILLE, | ) | |
| | ) | Honorable |
| Defendant-Appellee. | ) | Roger D. Rickmon, |
| | ) | Judge, presiding. |

_____

PRESIDING JUSTICE HETTEL delivered the judgment of the court.
Justices Holdridge and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court properly granted summary judgment in favor of defendant, on the grounds that absolute tort immunity applied.

¶ 2    Plaintiff, George Hidalgo, appeals from the Will County circuit court's order granting summary judgment in favor of defendant, the Village of Romeoville (Village), on his amended complaint. For the following reasons, we affirm.

¶ 3                                  I. BACKGROUND

¶ 4                                A. General Background

¶ 5         Beginning in 2017, the City of Des Plaines employed plaintiff to serve as a firefighter and paramedic on a rotating basis. From December 2 through 4, 2019, plaintiff attended an Advanced Technician Firefighter training course at the Romeoville Fire Academy (Academy). The purpose of the training course was to train experienced firefighters in skills needed to obtain their Advanced Technician Firefighter certification via a curriculum that included classroom instruction and hands-on practical evolutions[1].

¶ 6         One of the practical evolutions involved in the training course was a "bailout" drill, which was a drill that was used to teach the trainees how to evacuate a burning building from an elevated height. To complete the bailout drill, the trainees were required to exit a third-story window of a hose tower one leg at a time and then use rappel lines to perform a controlled descent down the side of the tower. The equipment that was needed to conduct the bailout drill included rope, carabiners, webbing, anchors, and hand tools. A portion of the rope was anchored to a steel post inside of the hose tower to form a bailout, or main, line. Another portion of the rope was connected to a pulley system at the top of the hose tower to form a safety, or belay, line. The carabiners were used to connect and lock the bailout and belay lines to D-rings on the trainees' harnesses, which, in turn, enabled the trainees to control their descent using friction.

¶ 7         Class 1 harnesses and Class 3 pre-sewn harnesses were also available for the trainees to use during the bailout drill. A Class 1 harness, or "gut belt," is a body harness that goes around a firefighter's waist, whereas a Class 3 pre-sewn harness is a manufactured body harness that goes

---

[1]Merriam-Webster Dictionary defines the term "evolution" as "one of a set of prescribed movements." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/evolution (last visited July 21, 2026).

around a firefighter's waist and shoulders. The trainees could have also created a Class 3 "hasty" harness out of the available webbing, a tubular structure that can be tied into a knot.

¶ 8    On December 4, 2019, the third day of the training course, plaintiff performed the bailout drill using a Class 1 harness. After plaintiff stepped out of the third-story window of the hose tower while performing the drill, he separated from his harness, fell to the ground, and was injured.

¶ 9                                B. Original Complaint

¶ 10    On November 30, 2020, plaintiff filed a one-count complaint in which he named the Village, the Romeoville Fire Department (Department), and the Academy as defendants. In the complaint, plaintiff alleged, in sum, that employees and/or agents of the Village, the Department, and the Academy had instructed him to wear a Class 1 harness, rather than an available Class 3 harness, while he performed the bailout drill; that those employees and/or agents had attached both the bailout and belay lines to his Class 1 harness; that, during the bailout drill, he had separated from his belt, fallen to the ground, and sustained serious injuries; and that his fall would have been prevented had he worn a Class 3 harness and his belay line been attached to something other than his Class 1 harness. Plaintiff further alleged that the Village, the Department, and the Academy had acted "intentionally and/or willfully/recklessly," in performing the following omissions:

"a. Fail[ing] to utilize available safety equipment for the drill involved.

b. Fail[ing] to use the Class 3 safety harnesses.

c. Fail[ing] to properly secure the Plaintiff's safety apparatus.

d. Fail[ing] to properly secure the Plaintiff for the drill involved.

e. Fail[ing] to properly attach the secondary safety rope to a different location on the Plaintiff.

f. Fail[ing] to attach the safety lines to a secondary source in case the gut belt failed.

3

g. Fail[ing] to ensure that the gut belts were securely fastened/closed.

h. Otherwise fail[ing] to take appropriate safety measures and/or ensure that all the trainees were provided appropriate safety equipment that was appropriately affixed to the trainees."

Plaintiff sought to recover for alleged injuries in the amount of $50,000, plus costs.

¶ 11                           C. Discovery and Witness Testimony

¶ 12       After plaintiff filed his complaint, the parties engaged in discovery. During the discovery process, depositions were taken of Michael Pemble, Brian Kulaga, John Yates, Patrick Hardin, Eric Willis, Andrew Clow, Jake Hoffman, Brian McMillin, and plaintiff, among others. Pemble, Kulaga, and Brandon Fletcher also provided affidavits.

¶ 13                           1. *Testimony of Michael Pemble*

¶ 14       In his affidavit, Pemble averred that he was the assistant fire chief of administration for the Village and the director of the Academy. Pemble stated that, in 2005, the Board of Trustees of the Village authorized the creation of the Academy, the purpose of which was to instruct the personnel of the Department, as well as "outside students from the fire service community." Pemble further stated that the Academy operated within the Department, which was, in turn, a department of the Village.

¶ 15       In his deposition, Pemble testified that the December 4 bailout drill was the first one that had been conducted at the Academy while Pemble was the director and that he had no personal knowledge of how bailout drills had been conducted at the Academy prior to his time as director. Pemble also testified that he had never reviewed the Academy curriculum with his predecessor and had not reviewed the guidelines for the instructors of the training course until after plaintiff's fall. Pemble stated that the guidelines did not specify where the belay line needed to be attached; that a Class 3 harness needed to be used; or that two, rather than three, points of contact were

4

needed. Pemble also stated that he was not aware of any law or regulation that mandated the type of harness that had to be used in bailout drills and that, as lead instructor of the training course, Kulaga had the authority to dictate the type of harness that was to be used in the December 4 bailout drill.

¶ 16     Additionally, Pemble stated that Kulaga had not been present at the training course on the day when plaintiff fell and that, in Kulaga's absence, Hardin had assumed the role of lead instructor for that day and had had the authority to decide how the December 4 bailout drill would be conducted. Pemble explained, however, that three assistant instructors had physically conducted the drill on-site and had had the authority to make decisions, some of which were subject to Hardin's approval. According to Pemble, those three assistant instructors were Willis, Clow, and Hoffman.

¶ 17                          2. *Testimony of Brian Kulaga*

¶ 18     Kulaga testified that he had begun teaching at the Academy in 2011 and had helped create the Academy's written guidelines as to how the bailout drill was to be conducted during the training course (Academy guidelines). Kulaga developed the Academy guidelines based on his experience as a firefighter and fire service instructor, as well as on his research into industry guidelines, including those issued by the National Fire Protection Association (NFPA guidelines). He also considered safety, efficiency, and the realism of the drill in drafting the Academy guidelines.

¶ 19     As to the NFPA guidelines, Kulaga determined that a bailout evolution could be classified as a self-rescue drill and that, consequently, the appropriate minimum standard for the December 4 bailout drill was subsection 7.10.2 of section 1407 (subsection 7.10.2) of the NFPA guidelines, which provided that, "[w]hen participating in an elevated emergency egress *** scenario, [a] fire

5

fighter in training shall be secured by a belay line and a Class 1 harness if *** [t]he firefighter is participating in a self-rescue drill." Kulaga explained that subsection 7.10.2 was a recommendation rather than a mandate and that he was unaware of any law or regulation that required a Class 3 harness to be used during bailout drills.

¶ 20    Kulaga further testified that, although he had had the authority to both exceed the minimum requirement set forth by subsection 7.10.2 and direct the trainees to wear a Class 3 harness during the December 4 bailout drill, he had made the "conscious decision" to allow the trainees to wear a Class 1 harness. Kulaga explained that, in his opinion, Class 3 harnesses were "impractical" for bailout drills because they were not designed for such drills, were "beyond the scope of the evolution," and did not "work in the evolution very well" because the harnesses were designed for "confined space operations" that did not involve the firefighting protective equipment that firefighters wore during bailout drills.

¶ 21    Kulaga further testified that neither a legal mandate nor the Academy guidelines specified where on the harness the bailout and belay lines had to be attached. Kulaga stated that, instead, instructors would use their basic firefighter knowledge to make certain decisions as to how to conduct a bailout drill. Kulaga explained that, for example, instructors would use their fire service knowledge and professional experience to decide where to attach the bailout and belay lines to the firefighters' harness.

¶ 22    As to the instruction that trainees would typically receive regarding the bailout drill, Kulaga explained the following:

> "The [trainees] would be generally educated about the evolution, the background behind it, and then they are told that this is an optional evolution. They are given direction on the Class [1] harness version of the gut belt and then the Class [3] option, and then they

6

are walked up to the location where the bailout will take place, and then they are shown the setup and walked through the setup, and they are given the option whether they want to take part in it or not."

Kulaga further stated that it was his understanding that trainees of the training course "should be made aware of the fact that a Class [3] harness is an option" that could be used during a bailout drill. Kulaga stated that it was also his understanding that the trainees were instructed regarding the benefits of using a Class 3 hasty harness and a second point of attachment for the belay line.

¶ 23    Additionally, Kulaga testified that about one-third of the trainees who had performed the bailout drill at the Academy during his time there prior to plaintiff's fall had used a Class 3 harness. Kulaga also testified that air packs, which were packs that supplied firefighters with air to breathe, were "occasion[ally]" used as points of attachment, but that, at some point, the air packs stopped being used after the manufacturer of the air packs had advised the fire service that the air packs should not be used for bailout drills because they were not rated for that purpose.

¶ 24    3. *Testimony of Brandon Fletcher*

¶ 25    In his affidavit, Fletcher averred that he had served as both a lead and assistant instructor at various fire academies and was "familiar with [bailout drills], having performed them and taught them [himself], and hav[ing] further observed the performance of [bailout] drills at numerous fire academies." Fletcher further averred that "[t]he use of belay lines is governed by the NFPA and [the Occupational Safety and Health Act (OSHA)], both of which prescribe the use of belay lines, and, taken together prescribe that a belay line must always be attached to a second point of attachment other than that to which the main line is attached." Additionally, Fletcher averred that he was aware that "[the Academy] believe[d] NFPA 1407, Section 7.10.2, only require[d] that

7

both the [bailout] line and belay line be attached to a singular class one harness," but that, in his opinion, the Academy had both "misinterpreted" and "misapplied" the section.

¶ 26                                    4. *Testimony of John Yates*

¶ 27        In his deposition, Yates, the owner of the company that manufactured truckman's belts bought by the Des Plaines Fire Department, testified that it was "not appropriate" for plaintiff to have worn only a truckman's belt "with one point of attachment on the front and one somewhere else" while performing the December 4 bailout drill. Yates further testified that the attachment of a belay line to a D-ring on the truckman's belt would not comport with the belt's manufacturing standards. Additionally, Yates testified that the "industry standard" and "standard protocol for fire departments doing higher altitude" was to use the Class 3 pre-sewn harness as a secondary safety harness.

¶ 28                                    5. *Testimony of Patrick Hardin*

¶ 29        Hardin testified that he had begun teaching at the Academy when it first opened. Although he was present at the training course throughout the day of plaintiff's fall, he did not observe the entirety of the December 4 bailout drill. Nevertheless, he knew that Clow had worked the belay line, that Willis had attached the rappel lines to the top of the hose tower, and that Hoffman had assisted Willis during the bailout drill.

¶ 30        Hardin explained that, before the trainees performed the December 4 bailout drill, they had been shown the equipment involved and provided a real-life scenario to imagine as they performed the drill. Hardin stated that a demonstration of the drill was typically provided whenever trainees requested one, but that he was not sure whether said demonstration had been provided on the day of plaintiff's fall. According to Hardin, the trainees were not instructed to bring air packs to use in

8

the training course because, during past bailouts, firefighters had either damaged the air packs or run out of air and discarded the air packs, making their inclusion in the bailout drill unrealistic.

¶ 31    To Hardin's knowledge, about half of the firefighters who had performed the bailout drill at the Academy prior to the training course wore Class 3 harnesses. Hardin testified that, at Willis's direction, the first group that performed the December 4 bailout drill had worn both a Class 1 harness and a Class 3 pre-sewn harness, and that the typical process was for the bailout line to be attached to the Class 1 harness and the belay line to be attached to the Class 3 harness. However, Hardin further testified that he did not witness where the bailout and belay lines had actually been attached during the December 4 bailout drill. After the first group began performing the bailout drill, McMillin, another assistant instructor, informed Hardin that the drill was taking too long because individuals in the first group were wearing Class 3 pre-sewn harnesses. Hardin then instructed McMillin not to use the Class 3 pre-sewn harnesses because they were not designed for use during bailout drills.

¶ 32    During Hardin's conversation with McMillin, a trainee referenced the minimum standard set forth by subsection 7.10.2 of the NFPA guidelines. Hardin responded to the trainee by stating that the trainee was not required to perform the bailout drill and that the Class 3 hasty harness was the appropriate harness to use for the evolution. In his deposition, Hardin explained that Class 3 harnesses were not useful during actual bailouts but that he had informed the trainees that they could use a hasty harness while performing the bailout drill because training scenarios typically utilized more safety devices than actual scenarios. Hardin stated that the first group of trainees, who had worn a Class 3 pre-sewn harness during the December 4 bailout drill, had greater "safety protections" than the second group of trainees, who had worn only a Class 1 harness. He was not aware of an incident in which a firefighter fell during a bailout drill performed in 2007.

9

¶ 33                                   6. *Testimony of Eric Willis*

¶ 34          Willis testified that he had begun teaching at the Academy in 2008 or 2009 and that he was the lead assistant instructor for the December 4 bailout drill. Willis explained that, during bailout drills, he would bring Class 3 pre-sewn harnesses to the drill site for firefighters to wear if they wanted to do so and for "an added layer of safety" while performing the drill. When a firefighter chose to wear both a Class 1 harness and Class 3 pre-sewn harness, the bailout line was attached to the Class 1 harness and the belay line was attached to the Class 3 harness.

¶ 35          Willis further testified that no demonstration of the bailout drill had been performed on the day of plaintiff's fall and that the first group that performed the December 4 bailout drill had been given the option to wear the Class 3 pre-sewn harness. Willis stated that approximately one half of the first group chose to wear the harness and that the others in the group decided not to do so because they felt that the drill took too long when they wore the Class 3 harness and wanted to complete the drill more quickly.

¶ 36          Willis witnessed the incident in 2007 in which a firefighter fell while performing a bailout drill. Willis explained that the firefighter fell because he had been wearing a leather truckman's belt while performing the bailout drill and the belt had dry rot, was not a Class 1 harness, and was not designed to be used during bailout drills.

¶ 37                                   7. *Testimony of Andrew Clow*

¶ 38          Clow testified that he had begun teaching at the Academy when it first opened and that he had never been "part of the decision-making role as to how to set up the training course." However, before the bailout drill started, Clow participated in a discussion with Hardin, Willis, McMillin, and Hoffman. During the discussion, they spoke about the equipment that the trainees would use to complete the drill. Clow explained that, of the possible types of harnesses, a "truckman's belt,"

10

which was a belt that had the primary purpose of holding tools and featured a clasp and a ring, was a type of Class 1 harness, which was used for self-rescue situations wherein a firefighter could be wearing turn out gear. Clow further explained that, in contrast, Class 3 harnesses were used for rescuing third persons from elevated or below-ground structures, wherein a firefighter would not be wearing turn out gear. According to Clow, a Class 3 harness would not be a part of a firefighter's turn out gear.

¶ 39    Clow further testified that he was "on shift" in 2007 when a Romeoville firefighter fell and injured himself while performing a bailout drill wearing only a truckman's belt. Clow explained that he did not observe the fall but that he had heard that the failure of the belt caused the fall.

¶ 40    8. *Testimony of Jake Hoffman*

¶ 41    Hoffman testified that he had been an instructor at the Academy since 2015 or 2016 and that, prior to the day of plaintiff's fall, he had never seen a firefighter perform the bailout drill from the third story of a hose tower while wearing only a truckman's belt. Hoffman further testified that he could not recall ever seeing a bailout drill being conducted the way that the drill had been on the day of plaintiff's fall.

¶ 42    Additionally, Hoffman testified that, on the day of plaintiff's fall, there had been no announcement made in his presence that Class 3 pre-sewn harnesses were available for the trainees to use while performing the December 4 bailout drill, but that Class 3 pre-sewn harnesses had been made available. Hoffman stated that some members of the first group of trainees that performed the December 4 bailout drill wore a Class 3 pre-sewn harness, but that the remaining trainees opted to wear a truckman's belt so that they could complete the drill more quickly. Hoffman also stated that plaintiff's fall would have been prevented if he had been wearing a Class 3 harness and that, if he himself were to have had to choose between wearing a Class 1 harness or Class 3 pre-sewn

11

harness while completing the bailout drill, he would have chosen to wear a Class 3 pre-sewn harness.

¶ 43                                         9. *Testimony of Brian McMillin*

¶ 44        McMillin testified that, while the December 4 bailout drill was ensuing, he walked over to the drill site and asked Clow how the evolution was progressing. McMillin stated that Clow told him that only one trainee had completed the drill by that point. McMillin then observed that some trainees were wearing Class 3 pre-sewn harnesses, which McMillin believed slowed the progress of the drill. McMillin stopped the evolution and discussed the use of Class 3 pre-sewn harnesses with Hardin to determine how Hardin wanted to proceed.

¶ 45                                         10. *Testimony of Plaintiff*

¶ 46        Plaintiff testified that he performed the December 4 bailout drill while wearing a Class 1 harness. Before plaintiff exited the third-story window of the hose tower to perform the drill, one instructor attached the bailout line to the front of his harness using a D-ring and carabiner and a second instructor attached the belay line to the back of his harness using another D-ring and carabiner. After an instructor affirmed that plaintiff's harness was properly secured, plaintiff exited the third-story window one leg after another and fell to the ground as he brought his second leg over the windowsill. While plaintiff was on the ground, he observed that his harness was still connected to the bailout and belay lines and suspended below the windowsill.

¶ 47     D. Motion for Summary Judgment, Motion to Amend the Pleadings, and Amended Complaint

¶ 48        On October 20, 2023, the Village filed a motion for summary judgment in which it argued that it had absolute immunity pursuant to sections 2-109 and 2-201 of the Local Governmental and Governmental Employees Tort Immunity Act (Act) (745 ILCS 10/2-109, 2-201 (West 2018)). The Village also argued that, in the alternative, it was entitled to summary judgment because plaintiff

12

had signed liability waivers prior to performing the December 4 bailout drill. The Village asserted that the liability waivers limited plaintiff to being able to prevail only on a claim for willful and wanton conduct, for which he had presented insufficient evidence.

¶ 49        On February 2, 2024, after the Village's motion for summary judgment had already been fully briefed, plaintiff filed a motion for leave to file an amended complaint. In his motion, plaintiff asserted that he had learned of new facts during the course of discovery and that he was seeking to file an amended complaint to conform his pleadings to the new facts and in light of the arguments that were contained in the briefs on the Village's motion for summary judgment. The Village filed a response in opposition to plaintiff's motion for leave to file an amended complaint. In its response, the Village argued that plaintiff's motion for leave to file an amended complaint was untimely and an improper attempt to evade an unfavorable summary judgment.

¶ 50        Following oral argument on the pending motions, the circuit court granted plaintiff leave to file his amended complaint, which he did on June 13, 2024. In his amended complaint, plaintiff named only the Village as a defendant. Plaintiff alleged that, "at all relevant times," the Village was an Illinois municipal corporation, the Department was a department of the Village, and that the Village, "via [the Department] and [the Academy], operated [the] fire training academy."

¶ 51        Additionally, the amended complaint contained two counts. Count I was for "intentional/reckless conduct" and contained similar allegations to those in the original complaint but alleged for the first time that the Village had made certain additional omissions. Specifically, plaintiff alleged for the first time that the Village had "[f]ailed to instruct trainees on the creation and/or use of Class 3 'hasty harnesses,' " "[f]ailed to inform trainees that they could use either type of Class 3 harnesses," "[f]ailed to provide adequate in-class training regarding the bailout drill," "[f]ailed to provide written instruction regarding the bailout drill," "[f]ailed to demonstrate

13

the bailout drill as a means of teaching," "[f]ailed to attach the Plaintiff's main line to the appropriate weight bearing D-ring," "[f]ailed to become familiar with the Plaintiff's Yates Gear Class 1 gut belt," "[f]ailed to require the Plaintiff to use one of [the Academy's] class 1 gut belts given said unfamiliarity with the Plaintiff's belt," "[f]ailed to consider the 2007 incident which made it patently obvious the inherent danger of using only belts while training the bail out drill," and "[f]ailed to modify how the bail out drill was done after the 2007 incident." Under count II, plaintiff alleged that the aforementioned omissions also constituted negligence.

¶ 52    On October 31, 2024, the circuit court granted the Village's motion for summary judgment. Plaintiff subsequently filed his notice of appeal.

¶ 53                                                    II. ANALYSIS

¶ 54    On appeal, plaintiff argues that the circuit court erred by granting summary judgment in favor of the Village. In turn, the Village argues that the circuit court erred by granting plaintiff leave to file his amended complaint. We will start by addressing the Village's argument.

¶ 55                             A. Motion for Leave to File Amended Complaint

¶ 56    The Village argues that the circuit court should not have granted plaintiff's motion for leave to file an amended complaint because the motion was "an obvious last ditch, 'Hail Mary' effort to defeat [the Village's] immunity defense." In response, plaintiff argues that the Village forfeited the issue raised in its argument by failing to file a cross-appeal in this matter.

¶ 57    "It is fundamental that the forum of courts of appeal should not be afforded to successful parties who may not agree with the reasons, conclusion or findings below." *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 386 (1983) (internal citation omitted). Accordingly, "[a] party cannot complain of error which does not prejudicially affect it, and one who has obtained by judgment all that has been asked for in the trial court cannot appeal from the judgment." *Id.*

14

However, "[f]indings of the trial court adverse to the appellee do not require the appellee's cross-appeal if the judgment of the trial court was not at least in part against the appellee." *Id*. at 387.

¶ 58        Plaintiff here instituted this appeal from the circuit court's order granting summary judgment in favor of the Village and no adverse judgment was entered against the Village. However, before the court entered the order granting the Village summary judgment, it entered a separate order granting plaintiff's motion for leave to file his amended complaint. Because the final judgment entered by the circuit court was not in any part adverse to the Village and the order granting the plaintiff leave to file his amended complaint was not itself a final judgment, the Village was not required to file a cross-appeal in this matter to challenge the circuit court's order granting plaintiff leave to amend. See *Palm v. 2800 Lake Shore Drive Condominium Association*, 2013 IL 110505, ¶ 21 ("An order dismissing a complaint with leave to amend is not a final judgment.").

¶ 59        Related to the merits of the Village's argument, a complaint may be amended "[a]t any time before final judgment." 735 ILCS 5/2-616 (West 2018). However, "a motion to amend that is no more than an attempt to evade an unfavorable summary judgment outcome should not be granted." *Freedberg v. Ohio National Insurance Co.*, 2012 IL App (1st) 110938, ¶ 44. In considering whether to allow leave to amend a pleading, a court should consider the following factors: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Henderson-Smith & Associates, Inc. v. Nahamani Family Service Center, Inc.*, 323 Ill. App. 3d 15, 26-27 (2001). "Whether to grant a plaintiff leave to amend a complaint is a decision that is left to the sound discretion of the circuit court, and under normal circumstances

15

leave to amend should be liberally granted." *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 13.

¶ 60　　　　Relevant to the enumerated factors, we note that, after plaintiff filed his original complaint in this case, discovery ensued and numerous witnesses were deposed. From the witnesses' depositions, plaintiff learned of various new facts, including how the training course and December 4 bailout drill were intended to be conducted, the design and appropriate use of the materials incorporated into the December 4 bailout drill, which employees of the Village had the discretion to make certain decisions regarding how the training course and December 4 bailout drill were to be conducted, which employees actually made such decisions, their reasons for said decisions, and that there was a 2007 incident in which a firefighter fell while performing a bailout drill at the Academy and wearing a truckman's belt. In his amended complaint, plaintiff then added allegations related to the new facts that he learned of during discovery.

¶ 61　　　　The new allegations that plaintiff added in his amended complaint bolstered his position in this litigation. Moreover, because the new allegations both derived from information that had been produced during discovery and related to the same events that had been alleged in the original complaint, it is unlikely that the Village was meaningfully prejudiced or surprised by the inclusion of the facts in the amended complaint. Additionally, plaintiff sought leave to file his amended complaint prior to entry of the final judgment and had not had a previous opportunity to amend. Consequently, we find that the circuit court properly granted plaintiff leave to file his amended complaint.

¶ 62　　　　　　　　　　　　　　　B. Summary Judgment

¶ 63　　　　Next, we consider whether the circuit court properly granted summary judgment in favor of the Village. "Summary judgment is appropriate whenever the pleadings, depositions,

16

admissions, and affidavits on file, viewed in the light most favorable to the nonmoving party, show there is no genuine issue of material fact between the parties and that the nonmoving party is entitled to judgment as a matter of law." *Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 228 (2007). A genuine issue of material fact exists when the material facts are disputed or when the material facts are undisputed but reasonable persons might draw different inferences from those facts. *Williams v. Village of Berkeley*, 2024 IL App (1st) 231481, ¶ 27. "[A]lthough the nonmoving party in a summary judgment motion is not required to prove his or her case, the nonmovant must nonetheless present a factual basis which would arguably entitle that party to a judgment." *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 517-18 (2000). "If the party moving for summary judgment supplies facts that, if not contradicted would warrant judgment in its favor as a matter of law, the opponent cannot rest on his pleadings to create a genuine issue of material fact." *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 470 (2001).

¶ 64        Summary judgment is a drastic means of disposing of litigation. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. Thus, when considering a motion for summary judgment, a court must construe the evidence of record strictly against the nonmoving party and award summary judgment only if the movant's right to judgment is "clear and free from doubt." *Id*. The appellate court reviews an order granting summary judgment *de novo*. *Michigan Avenue National Bank v. County of Cook*, 306 Ill. App. 3d 392, 398 (1999).

¶ 65        1. *Local Governmental and Governmental Employees Tort Immunity Act*

¶ 66        Relevant to this appeal, in 1965, the General Assembly enacted the Act to protect local public entities and their employees from liability arising from government operations, in response to the abolition of the common law doctrine of sovereign immunity. *Monson*, 2018 IL 122486, ¶

17

15. At common law, a municipality is immune from liability that arises from discretionary acts, but not from liability that arises from ministerial acts. *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 193-94 (1997). "Discretionary acts are those which are unique to a particular public office" and "involve the exercise of personal deliberation and judgment in deciding whether to perform a particular act or how and in what manner that act should be performed. *Hascall v. Williams*, 2013 IL App (4th) 121131, ¶ 25 (internal citation omitted); *Richter v. College of Du Page*, 2013 IL App (2d) 130095, ¶ 43. Conversely, "ministerial acts are those which a person performs on a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, and without reference to the official's discretion as to the propriety of the act." *Id* (internal citation omitted).

¶ 67      The common law distinction between discretionary versus ministerial acts has survived the abolition of the doctrine of sovereign immunity and is codified in sections 2-109 and 2-201 of the Act. *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 496 (2001); *Chicago Flood*, 176 Ill. 2d at 194. Section 2-109 of the Act states that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILCS 10/2-109 (West 2018). In turn, section 2-201 of the Act states that, "except as otherwise provided by [s]tatute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." *Id*. § 2-201.

¶ 68      "The distinction between a discretionary act and a ministerial act must be made on a case-by-case basis," and the supreme court has articulated a two-step test to assess whether an employee is entitled to immunity under section 2-201 of the Act. *Malinski v. Grayslake Community High School District 127*, 2014 IL App (2d) 130685, ¶ 8; *Hascall*, 2013 IL App (4th) 121131, ¶ 23.

18

Under the first prong of the test, "an employee may qualify for immunity if he holds either a position involving the determination of policy or a position involving the exercise of discretion." *Hascall*, 2013 IL App (4th) 121131, ¶ 23 (internal citation omitted). If the first prong of the test is met, then, under the second prong, the employee "must also have engaged in both the determination of policy and the exercise of discretion when performing the act or omission from which the plaintiff's injury resulted." *Id*. Policy decisions are decisions "requiring a governmental entity to balance competing interests and to make a judgment call as to what solution will best serve those interests." *Van Meter v. Darien Park District*, 207 Ill. 2d 359, 379 (2003).

¶ 69        The Act "grants only immunities and defenses; it does not create duties. Rather, the *** Act merely codifies existing common-law duties, to which the delineated immunities apply." *Hascall*, 2013 IL App (4th) 121131, ¶ 20. Consequently, "whether a local public entity owed a duty of care and whether that entity enjoyed immunity are separate issues," and a court will assess whether the Act applies only after the court first determines that a duty exists. *Id*. "Because the immunities afforded to governmental entities operate as an affirmative defense, those entities bear the burden of properly raising and proving their immunity under the Act." *Van Meter*, 207 Ill. 2d at 370.

¶ 70        There is a wealth of cases in which Illinois reviewing courts have assessed whether a local government employee is entitled to immunity under section 2-201 of the Act. First, in *Harinek v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335 (1998), the plaintiff alleged that the City of Chicago's fire marshal personally planned and conducted a fire drill, during which the fire marshal directed the plaintiff to stand near a door and the plaintiff was then hit by the door and injured when someone opened it without warning. *Harinek*, 181 Ill. 2d at 338. The plaintiff further alleged that the fire marshal acted negligently and willfully and wantonly by directing her to stand

19

near the door, failing to inspect the door to determine whether it was safe, failing to warn others of the danger of the door, and failing to establish alternate routes that did not involve the use of the door during the fire drill. *Id.*

¶ 71     On the issue of whether section 2-201 immunity applied, the plaintiff in *Harinek* conceded that the fire marshal's position involved the determination of policy or the exercise of discretion but argued that the fire marshal's actions were not determinations of policy. *Id.* at 341-42. The supreme court rejected the plaintiff's argument after noting that the plaintiff had alleged that the fire marshal was responsible for planning and conducting fire drills in the City of Chicago; that, in planning the drills, the fire marshal had to balance various interests, such as efficiency and safety; and that the fire marshal's alleged acts and omissions were part of his attempts to balance those interests. *Id.* at 342-43. Moreover, the court concluded that, based on the plaintiff's allegations, the fire marshal's alleged acts and omissions "[fell] squarely" the definition of policy decisions. *Id.* at 342.

¶ 72     Reviewing courts later applied the principles in *Harinek* in numerous other decisions. See, *e.g.*, *Monson v. City of Danville*, 2018 IL 122486, ¶ 38 (finding that there was insufficient evidence to establish that a city's handling of a sidewalk defect was an exercise of discretion, in that there was no evidence of the city's decision-making process or whether the city considered certain factors); *Brooks v. Daley*, 2015 IL App (1st) 140392, ¶¶ 18-19 (finding that the mayor of Chicago and his chief of staff served in positions that involved the determination of policy and the exercise of discretion because they, for example, chose who to select as high-ranking city officials, and that they engaged in policy decisions by balancing their personal preferences with considerations of " 'political backlash' " in deciding who to appoint); *Courson ex rel. Courson v. Danville School District No. 118*, 333 Ill. App. 3d 86, 91 (2002) (finding that a shop teacher's decision to remove

20

a safety shield was a discretionary policy decision because the teacher had to balance the interests of safety and efficiency, consider the students' individual abilities, and judge how to best perform his teaching duties); *Arteman v. Clinton Community Unit School District No. 15*, 198 Ill. 2d 475, 486-87 (2002) (finding that a school district's decision not to provide roller-blade safety equipment to students was a discretionary policy determination because, in making the decision, the school district had to consider factors, such as cost and availability of roller-blade equipment, the number of students that would participate, and the students' individual skill levels, and then balance student safety against cost effectiveness); *Harrison v. Hardin County Community Unit School District No. 1*, 197 Ill. 2d 466, 468, 474 (2001) (finding that a school principal made a policy decision when he had to consider the circumstances surrounding a student's request to leave school early, balance the student's desire to leave school early with the school's interest in an orderly dismissal and the possibility that other students would want to also leave early, and judge how best to perform his duties as a principal); *Johnson v. Decatur Park District*, 301 Ill. App. 3d 798, 800-01, 809 (1998) (finding that a tumbling coach made a policy decision in light of the fact that he had had to balance considerations as to tumblers' individual abilities against the resources of the park district with which he was employed and also judge how to perform his coaching duties).

¶ 73    The Village argues that the decision in *Chavez v. Village of Kirkland*, 2023 IL App (2d) 230009-U, is particularly analogous to this case and, therefore, instructive. In *Chavez*, the plaintiff, a police officer, sued a municipality for injuries that he alleged that he sustained during a TASER training that was conducted by an instructor. *Chavez*, 2023 IL App (2d) 230009-U, ¶¶ 4, 6. The matter proceeded to trial, at which the police chief for the municipality testified that he required officers who attended the TASER training to be tased because he believed it was important for them to experience the feeling. *Id*. ¶¶ 5, 6. The police chief further testified that TASER instructors

21

were required to follow corporate guidelines and that, although he did not control the specifics of the TASER training, he was presented with potential dates for the training and approved opening the training to other departments. *Id*. ¶ 6. He also testified that a police sergeant would handle the "specifics" of the training in accordance with TASER guidelines and that the instructor would not determine police policy or procedures but would determine the equipment needed for the training, how to obtain such equipment, where the training was to occur, how the training was to be conducted, and whether a trainee passed or failed the training. *Id*. The police chief stated that the instructor also helped develop TASER policies for the municipality. *Id*.

¶ 74       Additionally, the instructor in *Chavez* testified that, in his role, he was responsible for reviewing the municipality's written TASER policies and for organizing and implementing the TASER training for the municipality, which involved selecting a location for the training that had appropriate classroom space, proper presentation equipment, and sufficient space to conduct exposures and discharges. *Id*. ¶ 9. He also testified that he had had the discretion to deviate from TASER guidelines and had "routinely" made discretionary decisions within the guidelines such as how many exposures to give, whether the exposures should be given by alligator clips or probes, where on the body to place the exposures, and whether the trainee should be standing or kneeling when receiving the exposures. *Id*. The instructor further testified that he had chosen to use alligator clips on the plaintiff and had placed the clips on the plaintiff. *Id*.

¶ 75       Following the trial, the circuit court in *Chavez* determined that the municipality was not entitled to section 2-201 immunity. *Id*. ¶ 10. On appeal from the determination, the appellate court found that the instructor's position involved the exercise of discretion, based on the trial testimony that the instructor was responsible for organizing and implementing the TASER training; that the police chief deferred to the instructor as to how the training was to be run; and that the instructor

22

had to exercise personal deliberation in selecting the appropriate location to conduct the TASER training, how many exposures to give, whether the exposures were to be given by alligator clips or probes, the location of the exposures, and whether the trainees were to stand or kneel while receiving the exposures. *Id*. ¶ 23.

¶ 76 The appellate court in *Chavez* also considered whether the acts that allegedly caused the plaintiff's injuries were a determination of policy and an exercise of discretion. *Id*. ¶¶ 25-29. The court noted that the plaintiff had alleged that three acts caused his injuries and that those three acts were the conducting of the TASER training generally, the supervision or monitoring of the plaintiff after he had been tased, and the failure to place mats around the plaintiff while he was being tased. *Id*. ¶ 25. The court found that each of the three acts was a discretionary policy determination, for the collective reasons that there was testimony that the instructor had weighed competing interests, including those of safety and convenience, and determined that the fire department would be the best place to conduct the TASER training and not to place mats; that the instructor had considered the immediate availability of emergency medical technicians at the fire department, were anything to go awry; and that the instructor had weighed the interests of safety, learning objectives of the TASER training, and convenience in deciding where to place the alligator clips on the plaintiff. *Id*. ¶¶ 25-26. The court found that, consequently, the alleged injurious acts were a determination of policy and an exercise of discretion and that the trial evidence established section 2-201 immunity. *Id*. ¶¶ 27-29, 33.

¶ 77 2. *Application of the Two-Part Test of Section 2-201 Immunity*

¶ 78 Plaintiff in this case argues that section 2-201 immunity does not apply in relation to the alleged acts and omissions of assistant instructors Willis, Clow, and Hoffman. Plaintiff also argues

23

that nor does section 2-201 immunity apply in relation to the alleged acts and omissions of "lead and/or supervising instructors" Hardin and Kulaga.

¶ 79                    a. *Immunity Related to Assistant Instructors*

¶ 80        Relevant to the first prong of the two-part test of section 2-201 immunity, plaintiff argues that Willis, Clow, and Hoffman did not occupy positions that involved the determination of policy or the exercise of discretion because they were each required to follow the Academy guidelines for the bailout drill that Kulaga had developed. Plaintiff also argues that Willis, Clow, and Hoffman did not occupy such positions for the additional reasons that they needed the lead instructor's approval to alter the bailout drill and lacked the discretion to do less than the Academy guidelines for the drill required.

¶ 81        Contrary to plaintiff's position, Pemble testified that, as the assistant instructors who had physically conducted the December 4 bailout drill, Willis, Clow, and Hoffman had the authority to make certain decisions regarding the drill, albeit subject to Hardin's approval. Pemble further testified that the Academy guidelines did not specify certain details pertaining to the bailout drill, such as where the belay line needed to be attached; that a Class 3 harness needed to be used; or that two, rather than three, points of contact were needed. Willis also testified that he had regularly taken the initiative to bring Class 3 harnesses to bailout drills to further ensure the trainees' safety during the evolutions.

¶ 82        Plaintiff does not appear to have presented any evidence affirmatively showing that Willis, Clow, and Hoffman were unauthorized to exercise discretion in their roles as assistant instructors. Moreover, even if the available evidence were to indeed support plaintiff's assertion that Willis, Clow, and Hoffman lacked the authority to do less than the Academy guidelines for the bailout drill required, such would not necessarily negate a finding that their positions involved the exercise

24

of discretion. This is because the Academy guidelines were silent as to some aspects of the bailout drill and none of the available evidence showed that Willis, Clow, and Hoffman were unauthorized to decide to exceed the safety standards that had actually been set by the Academy guidelines when conducting the December 4 bailout drill. Such, in turn, suggests that Willis, Clow, and Hoffman were, thereby, still authorized to exercise at least limited discretion.

¶ 83        Nor does the fact that the lead instructor had to approve any decisions by Willis, Clow, and Hoffman to alter the bailout drill negate a finding that their positions as assistant instructors involved the exercise of discretion. This is because, although the lead instructor had to approve any decisions on the part of Willis, Clow, or Hoffman to alter the drill, the fact remained that the three assistant instructors were still authorized to make the decisions in the first instance, to later be approved or disapproved by the lead instructor. In this way, the positions of the three assistant instructors still called upon them to exercise discretion, even if the lead instructor later disagreed with any of the decisions that the assistant instructors had, in fact, made in their discretion. Therefore, we conclude that Willis, Clow, and Hoffman were in positions that involved the exercise of discretion, in satisfaction of the first prong of the two-prong test of section 2-201 immunity.

¶ 84        As to the second prong of the two-part test of section 2-201 immunity, plaintiff first argues that Willis, Clow, and Hoffman did not determine policy while exercising their discretion when they failed to attach the bailout and belay lines to separate harnesses or points of attachment. Plaintiff further argues that Willis and Hoffman did not do the same when they failed to attach his bailout line to the appropriate weight bearing D-ring.

¶ 85        Our review of subsection 7.10.2 of the NFPA guidelines and of the Academy guidelines reflects that both were silent as to how the bailout and belay lines were to be attached during a

25

bailout drill. Additionally, although Fletcher and Yates collectively testified that the NFPA, OSHA, the industry standard, and manufacturing standards required the bailout and belay lines be attached to separate harnesses or points of attachment and the bailout line to be attached to the appropriate weight bearing D-ring, Fletcher and Yates never specifically identified the standards or all of the relevant provisions of each source. Moreover, Kulaga testified that, rather than relying on subsection 7.10.2 of the NFPA guidelines or on the Academy guidelines, instructors would "utilize their discretion in terms of how they secure[d] the ropes and lines to the harness" during bailout drills. Kulaga further testified that, in utilizing their discretion, the instructors considered interests of safety, time efficiency, duration of the drill, and the realism of the drill. This evidence collectively suggests that Willis, Clow and Hoffman made conscious decisions regarding the attachment of plaintiff's bailout and belay lines during the December 4 bailout drill, rather than merely adhering to a mandate or acting in a prescribed manner.

¶ 86    Nevertheless, plaintiff also argues that Willis, Clow, and Hoffman did not determine policy while exercising their discretion because they were required to provide adequate in-class training regarding the bailout drill and to demonstrate the drill and yet failed to do either. Plaintiff asserts that, because the in-class training and demonstration of the drill were required, they amounted to no more than ministerial acts.

¶ 87    Initially, we note that plaintiff provides no evidence showing that instructors were required to demonstrate the bailout drill. Moreover, contrary to plaintiff's assertion that instructors were so required, Kulaga testified that, "[g]enerally," the instructors did not, "demonstrate *** the skill in terms of getting out the window, [and] all that kind of stuff[.]" Additionally, Hardin testified that a demonstration of the drill was typically provided only when the trainees requested one.

¶ 88    As to plaintiff's allegation that Willis, Clow, and Hoffman failed to provide adequate in-class training regarding the bailout drill, Kulaga indeed testified that instructors of the drill were required to show the trainees where the structures and lines used in the drill were tied and to demonstrate how the carabiner was wrapped. However, plaintiff presented no evidence showing that, during the December 4 bailout drill, Willis, Clow, and Hoffman omitted to show the trainees where the structures and lines used during the drill were tied or to demonstrate how the carabiner was wrapped. Moreover, although Kulaga testified that it was his "understanding" that trainees "should be made aware of the fact that a Class [3] harness is an option," the Academy guidelines that governed the December 4 bailout drill did not themselves require the assistant instructors to inform the trainees that they could use a Class 3 harness. Furthermore, Kulaga also testified that assistant instructors would use their firefighter knowledge to make certain decisions as to how to conduct certain aspects of bailout drills. Therefore, plaintiff's arguments concerning Willis, Clow, and Hoffman's alleged failures to provide adequate in-class training and to demonstrate the December 4 bailout drill are meritless.

¶ 89    Plaintiff also argues that Willis, Clow, and Hoffman did not create policy in exercising their discretion when they failed to inform the trainees who performed the December 4 bailout drill that Class 3 harnesses were available and to instruct the trainees on creating a Class 3 hasty harness. However, a review of the available evidence shows that the Academy guidelines did not require the assistant instructors to inform the trainees that Class 3 harnesses were available or to instruct the trainees on creating a Class 3 harness. Rather, in his deposition, Kulaga testified merely that, during bailout drills, trainees were told that they could choose to wear a Class 3 hasty harness if they felt unsafe wearing only a Class 1 harness and that the belay line would be attached to the Class 3 harness. As we earlier noted, Kulaga also testified that assistant instructors would use their

27

firefighter knowledge to make decisions as to how to conduct certain aspects of the bailout drills. Therefore, we find that Willis, Clow, and Hoffman's alleged failures were omissions of acts that involved the creation of policy in the exercise of discretion, in satisfaction of the second prong of the test of section 2-201 immunity. Moreover, we conclude that section 2-201 immunity applies in relation to Willis, Clow, and Hoffman, as a matter of law.

¶ 90                          b. *Immunity Related to Lead and Supervising Instructors*

¶ 91          As to the lead and supervising instructors of the training course, plaintiff alleges that Hardin improperly ordered the trainees of the December 4 bailout drill to cease wearing Class 3 harnesses and "omitted the need to ensure trainees knew Class 3 harnesses were available, as required by [the Academy's] protocol." Plaintiff asserts that Hardin testified that his decision to stop the use of Class 3 harnesses was based on his "mere adherence" to both the Academy guidelines and his understanding of subsection 7.10.2 of the NFPA guidelines. Plaintiff also points out that Hardin testified that he was unauthorized to make Academy policy, as well as that Pemble testified that Hardin had no authority to "go below" the Academy's policy and that Hardin's actions comported with such policy. Plaintiff argues that such evidence shows that Hardin could not, and did not, determine policy or exercise discretion in performing his alleged acts and omissions.

¶ 92          It is unclear what plaintiff means when he alleges that Hardin "omitted the need to ensure trainees knew Class 3 harnesses were available." However, to the extent that he means that Hardin ordered that the trainees no longer needed to be informed that Class 3 harnesses were available, he offered no evidence that Hardin did this. Therefore, the allegation is meritless.

¶ 93          Additionally, plaintiff's allegation that Hardin ordered the trainees of the December 4 bailout drill to cease wearing Class 3 harnesses out of "mere adherence" to the Academy guidelines and subsection 7.10.2 of the NFPA guidelines is contradicted by the available evidence. It is true

28

that such evidence reflects that both the Academy guidelines and subsection 7.10.2 provided for the use of the Class 1 harness during the December 4 bailout drill and that Hardin acknowledged that the minimum standards for the drill called for the use of a Class 1 harness. However, Hardin never testified that he ordered the trainees performing the December 4 bailout drill to cease wearing Class 3 pre-sewn harnesses based solely on this information. Rather, Hardin testified that he made the order after McMillin had informed him that the December 4 bailout drill was taking a long time because the trainees were using Class 3 pre-sewn harnesses. Hardin also explained that, based on his years of experience, he had formed the opinion that Class 3 hasty harnesses were appropriate to use during the December 4 bailout drill. Thus, Hardin's act of ordering the trainees of the December 4 bailout drill to cease using Class 3 pre-sewn harnesses was an act that involved the determination of policy in the exercise of discretion.

¶ 94 Relevant to the issue of whether Hardin's position involved the determination of policy or the exercise of discretion, we note that the Academy guidelines did not preclude instructors from using a Class 3 pre-sewn or hasty harness in addition to the Class 1 harness for which the guidelines provided. We further note that Pemble and Kulaga collectively testified that instructors had the authority to make certain decisions regarding how bailout drills were to be conducted, based on their knowledge and experience. Such demonstrates that Hardin's position indeed involved the exercise of discretion. Therefore, we conclude that section 2-201 immunity applies in relation to Hardin, as a matter of law.

¶ 95 As to Kulaga, plaintiff argues that section 2-201 immunity does not apply because the Academy guidelines, which Kulaga created, were based on Kulaga's incorrect understanding of subsection 7.10.2 of the NFPA guidelines and, consequently, did not accord with the provisions of the subsection. Even if it were, in fact, true that Kulaga misunderstood the provisions of subsection

29

7.10.2 and that the Academy guidelines did not adhere to these provisions, such would not preclude section 2-201 from applying. This is because Kulaga testified that he had developed the Academy guidelines based not just on the NFPA guidelines, but also on his experience as a firefighter and fire service instructor; his research into other industry guidelines; and considerations of safety, efficiency, and the realism of the bailout drill. Kulaga's testimony shows that his position involved the determination of policy and that he exercised discretion in determining policy, in satisfaction of the two-prong test of section 2-201 immunity. Therefore, we conclude that, as a matter of law, section 2-201 immunity applies with respect to Kulaga, as well.

¶ 96        Furthermore, we note that our determinations that immunity applies with respect to Hardin and Kulaga are not disturbed by the witness testimony that, in 2007, a firefighter fell while performing a bailout drill at the Academy while wearing a leather truckman's belt. Plaintiff notes that Hardin and Kulaga testified that they were not aware of this 2007 fall and argues that "[i]t is impossible" for the Village to assert that these two instructors "consciously made safety decisions concerning the drill while taking the prior fall into account" when both instructors did not even know about the fall to account for it. That Hardin and Kulaga did not know about the 2007 fall does not negate the fact that they occupied positions that involved the exercise of discretion and, after considering factors other than the 2007 fall, determined policy in exercising their discretion. It is for this reason that we find plaintiff's contentions regarding the alleged fall to be unpersuasive.

¶ 97                                3. *Immunity Related to the Village*

¶ 98        Next, plaintiff argues that the Village is not entitled to immunity under sections 2-109 and 2-201 of the Act because the Academy did not provide a service or benefit to the Village residents, there was no evidence that the trainees of the Academy provided firefighting or paramedic services within the Village, "outside students" were the source of funds through which the Academy

30

operated and profited, and the trainees who were deposed in this case were all employed by fire departments outside of the Village, meaning that the knowledge that they learned during the training course would not benefit the Village's residents. According to plaintiff, these facts indicate that the Academy "was clearly operating as an entity intended to earn a profit that did not perform a governmental function," precluding immunity under sections 2-109 and 2-201 of the Act from applying.

¶ 99        "The purpose of [the] Act is to protect local public entities and public employees from liability arising from the operation of government." 745 ILCS 10/1-101.1(a) (West 2018). "A local public entity includes a *** municipal corporation" and " 'public employee' means an employee of a local public entity." *Id*. §§ 1-206, 1-207. An entity is involved in the operation of government when "it is tightly enmeshed with government either through direct governmental ownership or operational control by a unit of local government." *Carroll v. Paddock*, 199 Ill. 2d 16, 27 (2002).

¶ 100       In his amended complaint in this case, plaintiff alleged that the Village, as the sole named defendant, was an Illinois municipal corporation, that the Department was a department of the Village, and that the Village, "via [the Department] and [the Academy], operated [the] fire training academy." Plaintiff also alleged that the instructors at the Academy were either employees of the Village, agents of the Village, or both. In its answer to the amended complaint, the Village admitted these same facts. Moreover, Pemble testified that the Academy operated within the Department, which was, in turn, a department of the Village. For these reasons, we conclude that the Village is entitled to immunity under section 2-109 of the Act.

¶ 101                              4. *Willful and Wanton Conduct*

¶ 102       Lastly, plaintiff argues that the alleged acts and omissions on the part of Willis, Clow, and Hoffman, Hardin, and Kulaga constituted willful and wanton conduct and, thereby, precluded

31

immunity from applying with respect to these same individuals and the Village. However, immunity under section 2-201 is absolute and not subject to any exceptions based on willful and wanton conduct. *Monson*, 2018 IL 122486, ¶ 29 ("Immunity under section 2-201 is absolute, covering both negligent and willful and wanton conduct."). Therefore, plaintiff's present argument is meritless, and we hold that the circuit court properly granted summary judgment in favor of the Village.

¶ 103                                    III. CONCLUSION

¶ 104          The judgment of the circuit court of Will County is affirmed.

¶ 105          Affirmed.